NEW JERSEY DEPARTMENT OF LAROR,
WORKMEN'S COMPENSATION BUREAU.

### THEODORE LIPINSKI, PETITIONER, v. CURTISS-WRIGHT CORPORATION, RESPONDENT.

Decided May 22, 1944.

For the petitioner, *Nathan Rabinowitz.*

For the respondent, *John W. Taylor.*

Petitioner testified that he was employed by the respondent to work in its trimming department, on February 17th, 1942; that he continued to be so employed until July 22d, 1942; that on July 10th, 1942, at 3:15 P. M., as he jammed a propeller into a vise he felt pain in his chest and immediate weakness; that he sat down and could not get up for some fifteen minutes during which time he perspired; that his foreman, Don Strang, asked him what the trouble was and he told Strang that something had "ripped" in his chest and that he couldn't move; that Strang said, "Oh! I've heard that before" and walked away; that he remained in a sitting posi-

tion until 4:00 P. M., his regular quitting time; that he then washed up and drove his own automobile to his home in Clifton, a distance of approximately ten miles from the plant which was located in Caldwell, New Jersey; that his chest at this time felt puffed up; that that night he felt tired and had pains in both elbows and went to bed at 7:30 P. M., however, generally speaking he felt all right during the night; that he continued to work until July 22d, 1942, although he says that between July 10th and July 22d, he did a lighter type of work and experienced shortness of breath after walking any great distance and had pains in his elbows; that he did not go to the plant hospital nor make any request for medical attention to the respondent; that he sought the services of his own personal physician, a Dr. Budd, on July 17th; that he went to Dr. Budd because he was tired out, had pains in his elbows and back; that he saw Dr. Budd again on July 22d, at which time an electrocardiogram study was made and was told by Dr. Budd to stay in bed for several weeks; that he stayed in bed for three weeks during which time he was attended by Dr. Budd; that when he returned to work the latter part of September, 1942, he was given light work for two or three months when he "got sick all over again;" that he thereafter stayed home for a month and then was given a job as an inspector; that he thereafter sought employment and now works for the Wright Aeronautical Company in Paterson as a tool crib attendant; that at the present time his back, chest and elbows are painful, he has shortness of breath, feels bloated up and has to walk up steps slowly; that he does not do any heavy lifting and takes it easy; that he loses occasional time from his present work.

On cross-examination the petitioner at first insisted that he was in perfectly good health prior to July 10th, 1942, however, he finally admitted that he had suffered pain over the outer aspect of the left elbow for a period of five years prior to July, 1942. He insisted that he described the alleged incident of July 10th, 1942, to Dr. Budd and specifically denied that he ever told Dr. Budd that he had pains in his chest radiating to both elbows for a period of six months prior to July, 1942. He also identified statements of claim made by

him to the Metropolitan Life Insurance Company on July 28th, 1942 (*R-1* in evidence) and November 7th, 1942 (*R-4* in evidence). His testimony indicated that petitioner received 71 cents an hour for a 40-hour week.

Joseph Lorenzo, testifying on behalf of the petitioner, stated that he worked with the petitioner for about a year prior to July, 1942; that in July, 1942, he worked at a job similar to that performed by the petitioner, working about six feet directly to the rear of the petitioner; that as he was working in this position on an unfixed date in July, 1942, he observed the petitioner go from his bench to a place where propeller blades were stacked and lift up a propeller blade, return to his bench and place the blade in a vise; that directly thereafter petitioner complained of pain and sat down; that the boss, Don Strang, came over and stated that there was to be no sitting down on the job; that petitioner then said that he felt poorly after he had lifted the blade following which he had suffered pain; that he had to lift blades for the petitioner thereafter; that petitioner worked on blades the remainder of the day but did no further lifting; that when petitioner sat down he was sweating: that he could not recall the exact date of that occurrence.

On cross-examination Lorenzo testified that the occurrence which he claims to have witnessed took place about 1:00 P. M.; that as far as he could see the petitioner had no particular difficulty in placing the blade in the vise; that the petitioner worked on the blade for a short period of time after placing the blade in the vise before he sat down; that petitioner after sitting down for about fifteen minutes continued to work for the remainder of the day.

Dr. Samuel Kleiner, an internist, testified that he examined petitioner September 24th, 1943; that petitioner did not appear to be acutely ill, his blood pressure was 140/90, pulse was strong and regular, the apex beat was in the fifth inter costal space and in the mid cavicular line, the heart sounds were muffled, and there were a few extra beats, there was some enlargement of the heart to the left, lungs were negative, liver and spleen were negative, and there was no edema of the lower extremeties, urine analysis was negative,

and Dr. Kleiner's diagnosis was myocardial damage, coronary infarction with the usual after effects. Dr. Kleiner estimated the petitioner's disability at 50 to 60% of the total.

On cross-examination Dr. Kleiner, when asked to assume that petitioner had informed Dr. Budd on July 17th, 1942, that he had suffered pains in his chest radiating down both arms for a period of six months prior to July, 1942, which pain caused him to stop what he was doing and came on on frequent intervals particularly following exertion or after eating meals, stated that the symptoms were consistent with a condition of coronary infarction, throughout that period of time.

Dr. Ernest Boas, of New York, a heart specialist testifying on behalf of the petitioner, stated that he examined the petitioner November 16th, 1943; that a fluoroscopic examination showed a slight enlargement of the left ventricle and left auricle, the first heart sound was a bit dull, there were no murmurs, blood pressure was 130/90, electrocardiograms showed slurring of O R S, there was a low T wave on all leads, there were abnormal R T segments on leads 2, 3, and 4, there was a deep Q wave in lead 4. Dr. Boas was of the opinion that the petitioner had suffered a cardiac infarction and was now suffering from the after effects of same, namely scarred and weakened heart muscle. In answer to a hypothetical question, he stated that it was his opinion that the petitioner's condition was causally related to the alleged episode of July 10th while at work. He further stated that the petitioner undoubtedly had an underlying arteriosclerotic condition, however, he felt that the alleged incident of July 10th caused the infarction and resulted in damage of the coronary artery wall. He allowed the petitioner a present disability of 50% of the total.

On cross-examination he admitted that if the petitioner suffered from chest pain which radiated down the both arms for a period of six months or more prior to July, 1942, that the petitioner undoubtedly had a cardiac condition which to some extent was disabling, therefore leading to the conclusion that the petitioner's entire disability at this time is not chargeable to the alleged accidental occurrence of July 10th.

He further admitted that the symptoms and complaints made by the petitioner prior to July, 1942, could be due to the after effects of an infarction and that the only way he could relate the infarction which he noted on examination to the petitioner's employment is by reason of the petitioner's history of an accidental occurrence at that time while at work. He admitted that he had not had an opportunity to examine the electrocardiogram studies made by Dr. Budd, the attending physician, within ten days after the alleged occurrence, and stated that such an examination would have aided him in determining when the infarction occurred. It should be noted that Dr. Boas expressed the thought that electrocardiograms will at best only show whether an infarction is of recent origin, that is within a month's time or older.

This concluded the petitioner's case.

On behalf of the respondent, Don Strang, the petitioner's foreman, testified that petitioner worked under him between March 8th, 1942, and August 29th, 1942, and that the payroll records indicated that petitioner was absent from work June 6th, June 9th, June 10th, June 11th, June 12th and June 13th, 1942, and last worked on August 29th, 1942. He stated that he had no recollection and could not recall petitioner ever complaining to him of any inability to do his regular work or any failure on the part of the petitioner to do his regular work. He also stated that had the petitioner complained to him he would have sent petitioner to the plant's infirmary and that the fact that he had not done so established in his mind exclusively the fact that petitioner had not complained or evidenced any disability. It was not until several months later that he was first informed that the petitioner was out of work due to a heart condition.

Dr. Rueben Budd testified that the petitioner first came to him on July 17th, 1942, at which time the petitioner stated that he had been to other physicians, the names of whom Dr. Budd could not recall, and that he had been referred to Dr. Budd for diagnosis; that petitioner at that time stated that he suffered from pain in his chest radiating down both arms for a period of six months prior to July, 1942; that the pain lasted anywhere from a few seconds to about a minute and

was located in the center of the chest radiating down both arms; that petitioner stated that he felt weak for about a minute following these attacks and had to stop whatever he was doing at the times of the attacks; that these pains also came on when petitioner attempted to do things in a hurry or when he was angry or when he was excited; that these attacks were noted after breakfast and at times petitioner perspired with the attacks; that these attacks occurred on an average of three times a day for the six months period prior to July, 1942; that petitioner gave him no history of a sudden attack while doing any particular thing at any particular time and that he gave no history of suffering a sudden attack while at work or at any other time, although he was asked if such an attack occurred; that the petitioner did not appear ill; that his blood pressure was 130/80; that he had enlarged tonsils and that the heart examination *per se* was negative; the electrocardiograms taken July 20th, 1942, before exercise, indicated a previous infarction of the anterior surface of the left ventricle and electrocardiograms taken after exercise, showed more marked depressions of the R T segments and changes in the T waves indicative of coronary insufficiency. By previous infarction Dr. Budd meant an infarction more than ten days old. He stated that a Wasserman test and a urine analysis were both negative. His diagnosis on physical examination and history was—possible coronary artery disease and he advised rest. He treated the petitioner and last saw petitioner on October 19th, 1942. Dr. Budd examined the electrocardiogram studies made by Dr. Boas on November 16th, 1943, and stated that these confirmed his opinion that the infarction indicated by the electrocardiograms taken July 20th, 1942, was an infarction of considerable duration and not a recent one. Dr. Budd stated that it was his opinion that the complaints made by petitioner and the symptoms manifested by him during the six months period prior to July, 1942, were consistent with a previous infarction and it was his opinion that the petitioner did not suffer a coronary infarction at a time immediately preceding his examination on July 17th, 1942.

Dr. George Olcott testified that he examined petitioner April 13th, 1943, and he stated that based on his examination and the testimony of Dr. Budd, as well as the electrocardiogram studies made by both Dr. Budd and Dr. Boas, it was his opinion that petitioner had suffered a coronary occlusion which must have antedated July, 1942, by a matter of several months. He stated further that the electrocardiograms taken July 20th, 1942, evidenced a healing process and that the nature of the healing process was such that the infarction must have occurred a matter of several months prior in order for evidence of the healing process to manifest itself on the electrocardiogram studies made.

On behalf of the respondent, the applications executed by petitioner for benefits under a group policy issued by the Metropolitan Life Insurance Company, were offered in evidence.

The petitioner was called as a rebuttal witness and when asked to contradict the testimony of Don Strang, he stated that it was his recollection that he told Don Strang that he was ill and couldn't continue to work.

I have listened to lengthy summation on the part of counsel and I have carefully considered the extensive notes which I made throughout the course of this trial.

It might be stated at the outset that the evidence in this case is such as cannot be reconciled. The contention of the petitioner is that he met with an accident on July 10th, 1942, when he was jamming or attempting to jam a propeller blade into a vise, immediately following which he was seized with a pain in his left chest which caused him to sit down and rest for fifteen minutes. That is seriously controverted by the respondent.

An attempt was made by petitioner to produce corroboration of his testimony by producing a witness, Lorenzo. Mr. Lorenzo's testimony did not particularly impress me.

It seems to me that the crux of the whole case rests entirely with what the petitioner told his attending physician, his personal physician, Dr. Budd. It was pointed out in *Consolidated Traction Co.* v. *Lambertson (Court of Errors and Appeals)*, 60 *N. J. L.* 452, that the declarations of a patient,

as to his symptoms, made to his physician for the purpose of treatment, are to be given great weight for the reason that the patient expects his physician to be guided by them in administering remedies, thus the patient has an incentive, beyond the ordinary obligation, to tell the truth.

It is interesting to note that the petitioner failed to call Dr. Budd, despite the fact that he selected Dr. Budd as his own personal physician and went to him when apparently he could not obtain relief or satisfaction from the other doctors, he had seen prior to going to Dr. Budd. Dr. Budd, when he did appear, contradicted the petitioner's testimony to a substantial extent. As appears from the testimony, the only history given Dr. Budd, by the petitioner, was that for the six months last prior to July, 1942, he had been suffering with chest pains, radiating down both arms, which lasted from a matter of a few seconds to a minute or so and which resulted in the petitioner feeling weak following the attacks, and caused him to stop work at the times of the attacks and to rest. These attacks, as described by the petitioner, came on whenever he did anything in a hurry, when he was excited or angry and frequently followed eating. He also stated that the attacks came on as often as three times a day and that in the course of these attacks he felt as though he was being crushed. In the history obtained by Dr. Budd there was a total absence of any episode occurring, on July 10th, 1942, a week prior to the date when Dr. Budd's services were sought and as a matter of fact, there was a total absence of a history involving the present alleged episode.

According to the petitioner, he worked after the alleged occurrence of July 10th, 1942, for a full week before going to a physician or before seeking medical attention, which is most unusual in a case of coronary thrombosis. Coronary thrombosis, when related to trauma, is generally a dramatic condition. It is not one where a person sits down for a few minutes' rest and then drives an automobile ten miles. Generally, it is a situation where the person suffering the attack experiences complete collapse. The mere sitting down for a few minutes' rest, together with a complaint of feeling puffed up in the chest with a pain in that area, is far from being

a state of collapse. Collapse, in its accepted sense, means a total paralysis, with the person being on his back and unable to move without the aid of someone.

There are in evidence two statements of claim made by the petitioner to the Metropolitan Life Insurance Company. *R-1,* dated July 28th, 1942, clearly indicates that, as of the aforesaid date, petitioner made claim for benefits, under the policy with that company, predicated on a claim of illness. This, as a matter of fact, is true with respect to both statements of claim. In answer to question No. 4, on each of these forms, which reads as follows: "What is the cause of your disability?" the words "coronary artery disease" were written down. That is exactly what Dr. Budd, the treating physician, diagnosed the petitioner's condition to be. Even more interesting is the answer to question No. 7, on the forms, which reads as follows: "Is this disability the result of injury or occupational disease arising out of and in the course of employment for wage or profit?" The answer given was "No."

These exhibits are further interesting, for in the one dated July 28th, 1942, it is stated that he worked until July 21st, 1942, and in the one dated November 7th, 1942, it is stated that petitioner was first disabled or totally disabled by reason of his alleged condition, October 28th, 1942.

There has been considerable medical testimony in this case and as in most cases of this kind, the testimony is considerably in dispute from the opinions of the doctors, produced on behalf of both parties, is it apparent that the correctness of the expert testimony is entirely dependent on the true history of the case.

Here we have proof through Dr. Budd, the petitioner's own personal and private physician, who was subpœnaed on behalf of respondent when petitioner failed to call him, that petitioner complained to him on July 17th, 1942, of having had attacks of pain in his chest, radiating down both arms, accompanied by perspiration and weakness following exertion or excitement or eating, and a history which completely and convincingly negatives the happening of any sudden and eventful occurrence while at work. Not only this, but the electro-

cardiogram studies, made by Dr. Budd July 20th, 1942, also negative the probability that the petitioner's infarction was suffered July 10th, 1942, for as described by Dr. Budd, his electrocardiogram studies show an infarction of more than ten days duration. If that be the fact, the infarction must have occurred prior to July 10th, because Dr. Budd saw petitioner on July 20th. That the infarction of an old one, occurring prior to July 10th, is borne out by the fact that they show evidence of a healing process. Such evidence would not appear in ten days' time, as stated by Dr. Olcutt.

Not only did the petitioner not suffer a state of collapse on July 10th, not only did he wait until the regular quitting time and drive his own automobile a distance of ten miles, but at no time did he ever make an effort on the day of the alleged occurrence, to go to the plant hospital, and at no time until July 17th, a week later, did he seek the services of his physician. It, also, appears that during the seven-day period following the occurrence he reported each day for work and worked the number of regular hours in a working day. It might also be stated in passing that there is proof in this case that petitioner was absent from work June 8th, 9th, 10th, 11th, 12th and 13th—in other words, absent for about one week in the month prior to the alleged incident without any reasonable explanation for that absence. In all probability, this absence was also due to the recurrent episodes experienced by him during the six months period prior to July, 1942, that is, his absence was in all probability the result of the pain experienced by him in his chest and radiating down both arms.

The two physicians that petitioner has relied on, Dr. Boas and Dr. Kleiner, are not treating physicians and have merely expressed opinions on a hypothetical question embodying the facts brought out in the petitioner's case. They were not present at a time subsequent to Dr. Rueben Budd's testimony and therefore were not called to rebut Dr. Budd's testimony.

In *Schlegel* v. *H. Baron & Co.*, 130 *N. J. L.* 611; 34 *Atl. Rep.* (*2d*) 132, Mr. Justice Heher, speaking for the Supreme Court said coronary thrombosis or occlusion "* * * is a condition that ordinarily ensues from coronary sclerosis or

other morbid state. In all events, the presumption is that it was due solely to disease; and the *onus* is on claimant to establish that the asserted accident was at least a contributory cause without which the occlusion would not have occurred."

It is also well settled that the burden of proof is upon the petitioner and that it is not enough to prove that injury or death "could have been" a result of an accident. Likewise, it is not enough to prove that an injury or death "may be" a result of an accident. *Calicchio* v. *Jersey City Stockyards Co.* (*Supreme Court*), 125 *N. J. L.* 112; 14 *Atl. Rep.* (*2d*) 465.

As pointed out by Mr. Justice Swayze, in *Reimers* v. *Proctor Publishing Co.*, 85 *N. J. L.* 441; 89 *Atl. Rep.* 931, the burden of proof is upon the petitioner. Mr. Justice Swayze said that where the attending physician refused to relate the deceased employee's death to an accident there was no basis for an inference to that effect by the court.

In *Markiewicz* v. *International Milk Co.*, 19 *N. J. Mis. R.* 57; 17 *Atl. Rep.* (*2d*) 158, 159, it was stated that a treating physician, who was acquainted with the patient's condition, "is in a better position to express an opinion as to the cause and effect than a mere medical expert * * *." See, also, *Krapowitch* v. *Public Service Railway Co.*, 3 *N. J. Mis. R.* 932, and *Kalesvick* v. *United States Metal Refining Co.*, 7 *Id.* 771.

Having in mind that Dr. Budd was the only attending physician produced and that the history given him was unquestionably a correct one inasmuch as it was to the petitioner's benefit to give Dr. Budd such a history in order that Dr. Budd could properly diagnose his condition and treat him for it. I feel that he is certainly the physician best able to express an opinion as to the cause of petitioner's condition and that his testimony outweighs the testimony of Dr. Boas and Dr. Kleiner, who were merely called as experts to testify and answer a hypothetical question.

I have, in the course of many years, heard several cases involving alleged heart conditions and never have I heard of a case where a man worked for a week following a heart attack suffered while at work.

It is my opinion after carefully considering the evidence that the alleged occurrence, of July 10th, 1942, described by the petitioner, is merely an after thought in the petitioner's mind. He had to fix a date for the purpose of his claim and it seems to me that this was done long after ne consulted Dr. Budd and long after he made claims against a policy of insurance issued by the Metropolitan Life Insurance Company. There is nothing in either of the claim sheets that petitioner filed with the Metropolitan Life Insurance Company which makes mention of an incident occurring July 10th, 1942, in fact, these statements negative the very thought of an accidental occurrence. I am convinced that petitioner's condition is a chronic one and was of at least six months duration prior to July, 1942, and that petitioner did not suffer any injury by reason of an accident arising out of and in the course of his employment by respondent.

It is therefore this 22d day of May, 1944, ordered that the petition herein filed be and hereby is dismissed.

JOHN J. STAHL,
*Deputy Commissioner.*